UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------X

UNITED STATES OF AMERICA

     13 Cr. 138 (RWS)

   - v. -

     OPINION

HECTOR SANTILLIAN, a/k/a "BANE,"
JUNIOR RIVERA-VASQUEZ

         Defendants.

-----------------------------------X

A P P E A R A N C E S:

    Attorney for the UNITED STATES OF AMERICA

    THE UNITED STATES ATTORNEY'S OFFICE
    One St. Andrew's Plaza
    New York, New York 10007
    By:  Kristy J. Greenberg, Esq.


    Attorney for Defendant HECTOR SANTILLIAN

    FEDERAL DEFENDERS OF NEW YORK, INC.
    52 Duane Street, 10th Fl.
    New York, New York 10007
    By:  Andrew Mark Thomas, Esq.
        Sabrina P. Shroff, Esq.

    Attorney for Defendant JUNIOR RIVERA-VASQUEZ

    ALAN MITCHEL NELSON
    3000 Marcus Ave., Suite 1e5
    Lake Success, New York 11042
    By:  Alan M. Nelson, Esq.
        Christine Delince, Esq.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8|7|13

**Sweet, D.J.**

On or about February 28, 2013, Defendant Hector Santillan ("Santillan") and Defendant Junior Rivera-Vasquez ("Rivera-Vasquez") (collectively, the "Defendants") were charged with conspiracy to distribute and possession with intent to distribute 500 grams and more of mixtures and substances containing a detectable amount of cocaine, in violation of 21. U.S.C. § 846. (*See* Dkt. 5, Indictment 13 Cr. 128 (RWS).)

Defendant Rivera-Vasquez moves the Court to suppress (1) all evidence found in a vehicle driven by Rivera-Vasquez on the day of his arrest, and (2) statements made by Rivera-Vasquez, under the Fourth and Fifth Amendments. Defendant Santillan moves the Court to suppress (1) all evidence found on Santillan's person and in a vehicle in which Santillan was a passenger on the day of his arrest, and (2) all statements made by Santillan, under the Fourth and Fifth Amendments.

For the foregoing reasons, Defendants' motion to suppress is denied.

## I. *PRIOR PROCEEDINGS & BACKGROUND*

On April 17, 2013, Defendants submitted a motion to suppress certain evidence obtained during a traffic stop and

subsequent search of the vehicle.  This motion was heard and marked fully submitted on June 5, 2013.

The dispute arises over a traffic stop that was conducted on February 12, 2013.  At approximately 12:14 p.m. on that date, a Westchester County Police Department Officer, Officer Moreira ("Officer Moreira"), was in his marked police vehicle on patrol on the Hutchinson River Parkway in the vicinity of Mill Road, New Rochelle, New York, and activated his vehicle's video recording device when he observed a grayish blue Volkswagen (the "Volkswagen") commit what he describes as several traffic violations.  (Complaint ("Compl."); ¶ 5.a.)  The video recording device created a video record of the view through the patrol car's front windshield beginning at approximately 12:14 p.m. and ending at approximately 1:54 p.m.  (Hearing Transcript, "Hr'g Tr."; 13:10-22.)

First, at approximately 12:14 p.m., the Officer began to follow the Volkswagen, which was several cars ahead of him.  (Government Exhibit 1, "Gov. Ex. 1"; at 12:13:55.)  Beginning in the left lane of the two-lane roadway, Officer Moreira passed two vehicles traveling in the right lane, switched into the right lane, and closed the distance between his vehicle and the Volkswagen.  (*Id.* at 12:13:55-12:14:16.)  At approximately that time, an SUV traveling in the left lane came within one car-

2

length of another vehicle and applied its brakes. Officer
Moreira did not stop or follow that SUV. A few seconds later,
the Volkswagen's right-side tires touched the solid white "fog
line" that divided the roadway from the shoulder. (Hr'g Tr.
14:07-16.) The vehicle's side tires touched the fog line for
five seconds. (*Id.* at 14:17-19.)

Officer Moreira did not halt the Volkswagen, but continued
to follow it, and approximately two minutes later the Volkswagen
applied its brakes, activated its left turn signal, and then
switched into the left lane. (Gov. Ex. 1 at 12:16:00-11.)
Officer Moreira followed the Volkswagen into the left lane. The
Volkswagen then passed a vehicle traveling in the right lane,
and activated its right turn signal at approximately the same
time as it changed lanes. (*Id.* at 12:16:15-23.)

Officer Moreira continued to follow the vehicle and
approximately sixty-seconds later, the Volkswagen braked,
activated its left turn signal, and switched into the left lane.
(*Id.* at 12:17:30-38.) Immediately preceding this, the vehicle
ahead of the Volkswagen had braked, activated its right turn
signal, and exited the roadway. (*Id.* at 12:17:30-41.) The
Volkswagen then activated its right turn signal and moved back
into the right lane, and Officer Moreira again followed into the
right lane. (*Id.* at 12:17:56.)

Just before 12:18 p.m., Officer Moreira activated his patrol car's emergency lights, and the Volkswagen moved into the shoulder of the roadway, stopped, and activated its hazard lights; Officer Moreira drove his patrol car directly behind the Volkswagen and stopped. (*Id.* at 12:18:10-16.) Officer Moreira could see the make, model and license plate number of the vehicle at this time.

At approximately 12:19 p.m., Officer Moreira exited his vehicle and approached the Volkswagen's driver's side door. (Gov. Ex. 1 at 12:19:30-35.) Officer Moreira identified himself as a law enforcement officer and spoke to the driver, Rivera-Vasquez, who identified himself in English and produced his license and the vehicle's registration. (Hr'g Tr. 21:01-10, 96:09-13.) Officer Moreira questioned Rivera-Vasquez about "where he was going [that] afternoon and where he was coming from." (Hr'g Tr. 21:13-16.) Rivera-Vasquez stated that he was going to Massachusetts, and had come from his passenger's aunt's home. (*Id.* at 97:08-18.) Rivera-Vasquez stated that he could not recall "any location specifically" for Santillan's aunt's home. (*Id.* at 21:23-25, 97:10-13.) Officer Moreira explained the traffic violations he had observed, and then crossed in front of the Volkswagen to the front passenger-side door, and spoke to Santillan, retrieving from him a photocopy of his

driver's license that identified him.  (Gov. Ex. 1 at 12:20:36-
12:21:03.)  Santillan explained that his aunt lived in New
Jersey.  During this time, Officer Moreira alleges that both
Defendants appeared nervous; they did not make eye contact,
their voices were shaking, and in particular Rivera-Vasquez's
hands were shaking.  (Compl. ¶ 5.a; Incident Report.)  In turn,
Santillan alleges that the vehicle was driven in accordance with
the traffic laws, and, in answering Officer Moreira's questions,
neither Defendant behaved suspiciously or appeared nervous.
(Hector Santillan Affidavit, "Santillan Aff."; ¶¶ 6, 10.)

Officer Moreira then returned to his patrol car with the
documents he had obtained from both Defendants.  While in the
patrol car, Officer Moreira verified the vehicle's registration,
which returned no red flags, and checked both Defendants'
licenses, which revealed no warrants or citations.  (Gov. Ex. 1
at 23:10-12, 137:18-21, 167:10-13.)

Approximately eight minutes into the stop, Officer Moreira
approached the driver's side of the vehicle once more.  (*Id.* at
12:26:6.)  At this point, Officer Cusano, another patrol
officer, had arrived on the scene and stood behind the
Volkswagen.  Officer Moreira directed Rivera-Vasquez to exit the
vehicle, and directed him to the space between the Volkswagen
and the patrol car, where Officer Cusano was waiting.  (*Id.* at
5

12:26:10-25.)  When asked further about his relationship with
Santillan and their trip, Rivera-Vasquez stated that he did not
know the name of Santillan's aunt, and that he did not know
Santillan well and had only met him 2-3 months ago.  Rivera-
Vasquez stated that he was driving Santillan to New Hampshire.
About a minute into questioning Rivera-Vasquez, Officer Moreira
directed him to turn around and place his hands on the trunk of
the Volkswagen and began to pat him down.  (*Id.* at 12:27:15.)
Officer Moreira removed Rivera-Vasquez's wallet from his back
pocket, opened it, inspected it, and placed it on the trunk of
the car.  Officer Moreira then reached into Rivera-Vasquez's
front pocket and removed a mobile phone, opened it, inspected
it, and placed it on the trunk of the Volkswagen.  Officer
Moreira then reached into Rivera-Vasquez's other front pocket
and inspected its contents.  (*Id.* at 12:27:15-12:28:10.)  No
weapons, sharp objects, or substances were found.  (*Id.*)

     After Officer Moreira finished his pat down and search of
Rivera-Vasquez's pockets, Officer Moreira directed Rivera-
Vasquez to the backseat of his patrol car, and did not permit
Rivera-Vasquez to retrieve his wallet or cell phone.  (*Id.*
12:28:44-48.)  Officer Moreira closed the door to his patrol
car, effectively locking Rivera-Vasquez in the backseat.  (Hr'g
Tr. 110:24-111:12.)  Rivera-Vasquez was not placed under arrest.

(*Id.*) Officer Moreira briefly conversed with Officer Cusano, and then approached the passenger side of the vehicle, questioned Santillan, and directed him out of the Volkswagen. (Gov. Ex. 1 at 12:32:18.) Santillan confirmed that he did not know Rivera-Vasquez well, and that they had stayed at Santillan's aunt's house for 1 or 2 days.

When asked where his belongings were, Santillan explained that they had just purchased items there, and pointed out his new underwear, socks and undershirts in the back of the car. (*Id.* at 12:32:45-60.) Officer Moreira asked Santillan how much money he had on him, and Santillan stated that he had $80. (Incident Report.) Officer Moreira ordered Santillan to turn around, place his hands on the vehicle's trunk, and began to pat Santillan down. Officer Moreira reached into Santillan's front pockets to inspect the contents. Officer Moreira then patted-down Santillan's rear pants pockets, and, detecting what Officer Moreira describes as a large bulge, removed a "stack of U.S. currency folded up in a rubber band." (Hr'g Tr. 32:21-24.) Aside from the currency, no sharp objects, weapons, substances, or anything else was found on Santillan. (*Id.*) When questioned further about the stack of money, Santillan admitted that he had $1000 on him, but explained that he thought Officer Moreira had been asking about the money in his front pocket. Officer

Moreira asked Santillan why he had so much money on him, and Santillan responded that he was going to pay Rivera-Vasquez something for driving him. Santillan was then directed to the backseat of Officer Cusano's patrol car, which could not be opened from the inside. (Gov. Ex. 1 at 12:33:02-12:33:46.) Santillan was not placed under arrest. (*Id.*)

Earlier, during the initial traffic stop, Officer Moreira alleges that he observed that the front passenger seat of the Volkswagen appeared to be higher in height than usual. The cushion of the seat was raised, and the leather was a different color and texture from the other seat. (Compl. ¶ 5.c.) In addition, before searching Santillan, Officer Moreira alleges that he had observed two energy drinks in the center console of the vehicle, and also noted "more than one cell phone" in the vehicle. (Hr'g Tr. 164:01-03.) Officer Moreira explained that in his experience, a vehicle containing more than one cell phone indicates drug activity. (*Id.* at 164:06-09.) Officer Moreira did state, though, that this did not raise his suspicion levels "in and of itself," and the fact that a vehicle with two occupants had more than one mobile phone did not strike the Officer as "unusual." (Hr'g Tr. 164:16-18.)

Seventeen minutes into the stop, each Defendant was now, having been questioned and patted down, with cell phones and

8

wallets removed, locked in backseats of two different patrol cars. (Gov. Ex. 1 at 12:18:00-12:35:10.) Around this time, Officer Moreira opened the rear door of his patrol car and asked Rivera-Vasquez if he would allow the officers to search the Volkswagen in Spanish, and Rivera-Vasquez consented. (Hr'g Tr. 125:22-126:04.) Officer Moreira did not, at this time, inform Rivera-Vasquez that he could refuse consent to the search, or present him with a printed consent-to-search form. (*Id.*) Officer Moreira also asked Rivera-Vasquez if Santillan was going to pay him, and Rivera-Vasquez stated that Santillan had said: "we'll see."

Both Officers then searched the interior of the vehicle for about twenty minutes, and noticed a plastic wrapping in the space between the "cushion and the back rest" of the passenger seat. (Hr'g Tr. 42:18-20.) Officer Moreira stated that the "wrapping" was "consistent with that of wrapping of narcotics." (*Id.* at 41:05-17.) Officer Moreira then requested that a narcotics dog come to the scene. (Hr'g Tr. 40:23-41:04.)

While waiting for the narcotics canine to arrive, approximately thirty-seven minutes after the initial stop began, Officer Moreira spoke to Rivera-Vasquez, and cited him for three traffic violations: (1) moving from lane unsafely; (2) exceeding the speed in zone; and (3) following too closely (i.e.

tailgating).  (Gov. Ex. 6; 7; 8; the "Traffic Tickets".)
Officer Moreira continued to question Rivera-Vasquez regarding
Rivera-Vasquez's job, his travel, and another license plate
found in the Volkswagen.  Rivera-Vasquez was asked if he knew
the speed limit, and Rivera-Vasquez incorrectly stated that it
was 65 miles per hour.

A Westchester County Police Department Sergeant and a
Westchester County Police Department Detective arrived on the
scene in two other police vehicles at about 1:25 p.m.,
approximately one hour and seven minutes after the traffic stop
began.  (Gov. Ex. 1 at 13:25:31.).  The Volkswagen, Officer
Moreira's vehicle, and Officer Cusano's vehicle were moved to
allow the narcotics canine to inspect the Volkswagen.  The
trained narcotics detention canine conducted an inspection of
the Volkswagen, and the inspection of the front passenger seat
was positive for the presence of illegal drugs.  (Compl. ¶ 5.e.)
Officer Moreira then pulled back the seat and observed two
packages with plastic wrapping.  (Hr'g Tr. 50:05-14.)

A. The Arrest of the Defendants, the Recovery of the Packages
   and Rivera-Vasquez's Post-Arrest Statement

At this time, Officer Moreira placed both Defendants under
arrest. (Compl. ¶ 5.g.)  While Officer Moreira transported

10

Rivera-Vasquez to the police precinct, Officer Moreira alleges that Rivera-Vasquez made spontaneous statements that the drugs did not belong to him, asked how he could prove that the drugs did not belong to him, and stated that this was the first time he had been pulled over.

Once at the precinct, at approximately 2:58 p.m., the officers had Rivera-Vasquez sign a written consent-to-search form for the car. (Hr'g Tr. 52:10-25.) At the precinct, two DEA Agents ("Agent-1" and "Agent-2") then advised Rivera-Vasquez of his *Miranda* rights, and Rivera-Vasquez waived those rights in writing. (Compl. ¶ 6.c.; *see* Rivera-Vasquez *Miranda* Waiver Form.) Rivera-Vasquez provided a post-arrest statement. (Compl. ¶ 6.c; *see* DEA Report of Investigation.) Santillan did not make post-arrest statements.[1]

The Volkswagen was brought to a police facility, where DEA Agents conducted another search of the vehicle. During the course of that search, agents discovered a concealed compartment, or "trap," located under the passenger seat of the Volkswagen. In the trap, agents observed certain packages. When they opened these packages, agents observed a substance

---

[1] At no point after the arrest or during the car ride to the precinct, and up until Rivera-Vasquez had signed his consent-to-search form at the precinct, were either Defendant read or notified of their *Miranda* rights.

that was field tested, which resulted in a positive test for cocaine. (Compl. ¶ 6.b.) Both Defendants were ultimately charged with conspiracy to distribute and possession with intent to distribute cocaine.

## II. THE TRAFFIC STOP

Defendants maintain that the initial traffic stop was pretextual, without foundation, and thus invalid under the Fourth Amendment.

The Fourth Amendment protects the "right of the people to be secure in their persons ... against unreasonable searches and seizures." U.S. Const. Amend. IV. This protection extends to vehicle stops. *Whren v. United States,* 517 U.S. 806, 809-10, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). "[A]n ordinary traffic stop constitutes a limited seizure within the meaning of the Fourth and Fourteenth Amendments." *United States v. Scopo,* 19 F.3d 777, 781 (2d Cir.1994) (alteration in original) (internal quotation marks omitted). To justify a traffic stop, "the police must have either 'probable cause or a reasonable suspicion, based on specific and articulable facts, of unlawful conduct.'" *United States v. Gaines,* 457 F.3d 238, 243 (2d Cir.2006) (quoting *Scopo,* 19 F.3d at 781-82); *United States v. Harrison,* 606 F.3d 42, 45 (2d Cir.2010) (citation and internal

quotation marks omitted) ("[T]he Fourth Amendment requires that
an officer making a traffic stop have probable cause or
reasonable suspicion that the person stopped has committed a
traffic violation or is otherwise engaged in or about to be
engaged in criminal activity."). "[R]easonable suspicion of a
traffic violation provides a sufficient basis under the Fourth
Amendment for law enforcement officers to make a traffic stop."
*United States v. Stewart,* 551 F.3d 187, 193 (2d Cir.2009). In
determining whether the police have reasonable suspicion, we
must consider the "totality of the circumstances." *United States
v. Sokolow,* 490 U.S. 1, 8 (1989) (internal quotation marks
omitted).[2]

Here, Officer Moreira reasonably believed, and the video
shows, that (1) the Volkswagen touched the fog line for
approximately five seconds (*see* N.Y. Veh. & Traf. Law § 1128(a)
(vehicle shall be driven as nearly "as practicable entirely
within a single lane")); (2) the Volkswagen, according to his
experience, was speeding (*see* N.Y. Veh. & Traf. Law § 1180D);
(3) the Volkswagen changed lanes without signaling for
sufficient distance before making the change (*see* N.Y. Veh. &

---

[2] Defendant Santillan has a constitutional right to challenge the traffic
stop. When police make a traffic stop, a passenger in the car, like the
driver, is seized for Fourth Amendment purposes and so may challenge the
stop's constitutionality. *Brendlin v. California*, 551 U.S. 249, 249 (2007).

Traf. Law §§ 1128A; 1163 ("A signal of intention to turn right or left when required shall be given continuously during not less than the last one hundred feet traveled by the vehicle before turning")); and (4) the Volkswagen was trailing too closely to the car in front of it (*see* N.Y. Veh. & Traf. Law § 1129A ("The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway.")).

While Defendants argue that Officer Moreira's primary motivation for stopping the car was improper, there is simply no evidence to support the theory that Officer Moreira purposely targeted out-of-state vehicles, or knew of the Defendants' race before he stopped the Volkswagen. In any case, even if Defendants could demonstrate that the stop were pretextual, as long as Officer Moreira had reasonable suspicion to believe that a traffic violation had occurred, whether he had an "ulterior motive" is irrelevant to the Fourth Amendment analysis. *See, e.g.*, *Whren v. United States,* 517 U.S. 806, 812 (1996); *United States v. Dhinsa,* 171 F.3d 721, 724-25 (2d Cir.1998) ("[A]n officer's use of a traffic violation as a pretext to stop a car in order to obtain evidence for some more serious crime is of no constitutional significance."). And, as evidenced, Officer

14

Moreira did have a reasonable suspicion that traffic violations had occurred. Indeed, Officer Moreira issued traffic tickets to Rivera-Vasquez for speeding, following another vehicle too closely, and moving from a lane unsafely. (Gov. Ex. 1 at 12:16:25-12:17:37.) Regardless of whether Officer Moreira's belief as to the traffic violations was mistaken, or the stop was pretextual, Officer Moreira's reasonable suspicion that the Volkswagen was violating traffic laws is thus enough to justify the stop at its inception. *See, e.g., United States v. Jenkins,* 452 F.3d 207, 211-12 (2d Cir.2006) ("[B]ecause the officers had a reasonable but mistaken belief that the SUV lacked license plates, stopping the vehicle was 'justified at its inception.'") (quoting *Terry v. Ohio,* 392 U.S. 1, 20 (1968)); *Holeman v. City of New London*, 425 F.3d 184, 189 (2d Cir.2005) (emphasis added) ("The Fourth Amendment requires that an officer making [a traffic] stop have probable cause *or reasonable suspicion* that the person stopped has committed *a traffic violation* or is otherwise engaged in or about to be engaged in criminal activity."); *U.S. v. Stewart,* 551 F.3d 187, 191-192 (2d Cir. 2009).

### III. OFFICER MOREIRA'S DETENTION OF DEFENDANTS FOLLOWING THE TRAFFIC STOP

Defendants argue that the officers lacked probable cause or reasonable suspicion to continue to detain either Defendant

after determining that the vehicle was properly registered, and
that neither Defendant's license raised red flags.

The temporary detention of a motorist upon probable cause
to believe that he has violated traffic laws does not violate
the Fourth Amendment's prohibition against unreasonable
seizures, even if a reasonable officer would not have stopped
the motorist absent some additional law enforcement objective.
*See Whren v. United States*, 517 U.S. 806, 806 (1996).  However,
a seizure justified "solely by the interest in issuing a warning
ticket to the driver can become unlawful if it is prolonged
beyond the time reasonably required to complete that mission."
*Illinois v. Caballes*, 543 U.S. 405, 407 (2005); *see also United
States v. Harrison*, 606 F.3d 42 (2d Cir. 2005) (a violation can
occur if the inquiries "measurably extend the duration of the
stop.") (quoting *Arizona v. Johnson*, 555 U.S. 323 (2009)).
Still, "[a]n officer's inquiries into matters unrelated to the
justification for the traffic stop . . . do not convert the
encounter into something other than a lawful seizure, so long as
those inquiries do not measurably extend the duration of the
stop."  *United States v. Harrison*, 606 F.3d 42 (2d Cir. 2005)
(quoting *Arizona v. Johnson*, 555 U.S. 323 (2009)).

As an initial matter, the length of the traffic stop did
not violate either Defendant's rights.  Approximately seventeen

minutes elapsed between Officer Moreira's approach of the
Volkswagen at 12:18 p.m., and Rivera-Vasquez's consent to search
the car at 12:35 p.m. This length of time has been recognized
as reasonable. *See Harison*, 606 F.3d at 45 (recognizing that
stops lasting up to seventeen minutes have been recognized as
reasonable); *see also United States v. Hernandez*, 418 F.3d 1206,
1212 n.7 (11th Cir. 2005) ("Where at its inception a traffic
stop is a valid one for a violation of the law, we doubt that a
resultant seizure of no more than seventeen minutes can ever be
unconstitutional on account of its duration: the detention is
too short . . . Even *if* seven minutes is some minutes longer
than the norm, we question whether the Fourth Amendment's
prohibition of unreasonable seizures is concerned with such
trifling amounts of time, when the seizure was caused at the
outset by an apparent violation of the law. Of trifles the law
does not concern itself.").[3]

---

[3] *United States v. Richardson*, cited by Defendants, is inapposite. 949 F.2d
851, 857 (6th Cir. 1991). In that case, after defendant voluntarily refused
consent to search, four officers placed defendant in the back of a police
car, and then re-asked defendant for his consent. *Id.* The court explained,
"we have no doubt that if after refusing to consent to a search, a reasonable
person was placed in the back of police car by law enforcement agents who had
no intent to allow him to leave, that person would have believed that he was
not free to leave" and consent would become involuntary. *Id.* Here, Rivera-
Vasquez never previously denied consent, and was told he was not in trouble
and asked to wait in the back of the car. Moreover, because no *de facto*
arrest occurred, consent was not "preceded by an unlawful government seizure"
sufficient to undermine the consent. *United States v. Murphy*, 703 F.3d 182,
190 (2d Cir. 2012).

17

Nor was it unconstitutional for Officer Moreira to ask questions about the occupants' comings and goings or question them separately, including removing each from the vehicle. *See Harrison*, 418 F.3d at 45 (the Second Circuit found that even when a police officer had all of the information needed to issue the traffic ticket before he first approached the people in the car, the officer's questions to corroborate the driver's story, and ask questions about the passengers' comings and goings did not unconstitutionally prolong the stop), *see also Maryland v. Wilson*, 519 U.S. 408, 408 (1997) ("An officer making a traffic stop may order passengers to get out of the car pending completion of the stop."). Defendants' contention to the contrary that this questioning, because it occurred after the officers had confirmed the DMV and warrant checks, "measurably extend[ed]" the stop is simply unsupported by precedent. *See, e.g. United States v. Turvin,* 517 F.3d 1097, 1103-04 (9th Cir.2008) (holding that a 14-minute period of questioning was not unlawful because "officers do not need reasonable suspicion to ask questions unrelated to the purpose of an initially lawful stop [where the questioning] did not unreasonably prolong the duration of the stop"). As *Hernandez* and similar precedent make clear, it was reasonable under the circumstances for Officer Moreira to separate the driver and passenger to question them in

18

an attempt to corroborate their stories.  In *United States v. Hernandez*, 418 F.3d 1206 (11th Cir. 2005), for example, a trooper became suspicion when the driver said that he was speeding because he had to use the bathroom even though a rest stop was a mile earlier on the road, and the passenger said she was visiting a sick aunt but had difficulty answering where the aunt lived.  The trooper therefore questioned the driver and passenger separately, even after the driver's license and warrant checks came back negative.  When the trooper was still suspicious after the questioning, he asked for consent to search the car, and proceeded to search for twenty minutes.  *Id.*  The Eleventh Circuit observed that these facts, including the discrepancies in the detainees' stories about the trip's length and purpose, the abnormal nervousness in both detainees, the lack of knowledge on the trip's destination, and the minimal luggage for the trip, created sufficient reasonable suspicion of illegal activity for the officer to detain the vehicle and its passengers.  *Id.* at 1211.  Once the trooper developed this reasonable suspicion, he had a "duty to investigate more" and his seventeen-minute long detention and questioning following the stop and preceding consent to search was lawful.  *Id.*

Similarly in *United States v. Harrison*, the Second Circuit held that even when a police officer had all of the information

19

needed to issue the traffic ticket before he first approached the vehicle's occupants, the officer's decision to question the driver and the passenger separately about where they were going, why and with whom, in an effort to determine if they corroborated each other's stories, and then to return back to the driver again for more questioning, did not prolong the stop so as to render it unconstitutional. *Id* (recognizing that "longer intervals than five to six minutes, inducing a seventeen minute interval, have been deemed reasonable.").

Here, just as in *Hernandez* and *Harrison*, the Defendants' answers heightened Officer Moreira's suspicions: Rivera-Vasquez did not know Santillan's aunt's name or the location of her house, and he stated that he did not know Santillan well, yet was traveling out of state with him on an overnight trip. (Hr'g Tr. 24:20-25:22). Santillan was also not able to state the city they had stayed in. (*Id.*) Further, both Defendants "appeared very nervous, were avoiding making eye contact," "were speaking a low voice" and Rivera-Vasquez's "hands were shaking" and had no luggage. (Hr'g Tr. 22:13-20.) Finally, Officer Moreira testified that when Santillan exited the car, he observed that the passenger's seat in the car was higher and a different color than the driver's seat. (Hr'g Tr. 30;21-31:6.) These factors justified Officer Moreira's continuing to detain and question

the Defendants for the seventeen minutes preceding the consent to search.

Further, once Rivera-Vasquez consented to the search, it was not unreasonable to detain either defendant while officers searched the car, or while the narcotics canine surveyed the Volkswagen for drugs.[4] *See Illinois v. Caballes*, 543 U.S. 405, 409 (2005) ("The use of a well-trained narcotics-detection dog . . . generally does not implicate legitimate privacy interests."). The dog sniff was performed on the exterior of respondent's car while he was lawfully seized for a traffic violation. Any intrusion on either Defendant's privacy expectations does not rise to the level of a constitutionally cognizable infringement. *See id.*

The traffic spot in totality is therefore permissible under the Fourth Amendment. *United States v. Perea*, 986 F.2d 633, 644 (2d Cir. 1993).

## A. The Traffic Stop was not Transformed into an Investigative Stop or a *De Facto* Arrest

Defendants assert that once Officer Moreira approached the Volkswagen a second time to question the Defendants, it became

---

[4] In total, from the time that Officer Moreira first observed Rivera-Vasquez commit his first traffic violation to the time that drugs were discovered after the canine search of the car, approximately an hour and fifteen minutes had transpired.

an investigative stop requiring reasonable suspicion. This assertion is misplaced: courts have established that questioning "unrelated to the purpose of an initially lawful stop" does not unreasonably prolong a traffic stop or create an investigate detention requiring reasonable suspicion. *See Turvin*, 517 F.3d 1103-04. In any event, Officer Moreira has articulated facts, including multiple phones, a difference in the seat colors, behavioral nervousness, discrepancies in Defendants' stories as to their comings and goings, which created a sufficient "minimal level of objective justification" to question the Defendants. *See United States v. Sokolow*, 490 U.S. 1, 7 (1989).

Similarly, Defendants are incorrect that the duration of the stop, or placing Defendants in the back of the police car during questioning without their phones or wallet, constituted a *de facto* arrest. "In determining whether a [traffic] stop is sufficiently intrusive to ripen into a *de facto* arrest, the Second Circuit considers the amount of force used by the police, the need for such force, and the extent to which an individual's freedom of movement was restrained, and in particular such factors as the number of agents involved, whether the target of the stop was suspected of being armed, the duration of the stop, and the physical treatment of the suspect, including whether or not handcuffs were used." *United States v. Vargas*, 369 F.3d 98,

22

101 (2d Cir. 2004) (citing *United States v. Perea*, 986 F.2d 633, 645 (2d Cir. 1993)). In this case, no force was used at any time, and only three officers were present in total with the two Defendants. (*Id.*) The stop lasted only seventeen minutes from inception until consent was given to search the car. No firearms were drawn during the encounter, and neither Defendant was handcuffed or placed under arrest until the conclusion of the stop. (Hr'g Tr. 27:14-17; 33:19-22; 15:5-13.) In fact, Officer Moreira explained to each Defendant that they were not under arrest. (Hr'g Tr. 27:1-6; 27:9-13; 33:7-18.) Further, Officer Moreira's means were "no more intrusive than necessary." Given the placement of the Volkswagen and the police cars on the narrow shoulder of the highway, seating the Defendants in the patrol cars provided a safe and reasonable location for them out of the way of traffic while Officer Moreira questioned each separately, and during the search of the car. In sum, the duration and nature of the stop does not rise to the level of a *de facto* arrest and was permissible under the Fourth Amendment. *Cf. Dunaway v. New York*, 442 U.S. 200, 212 (1979) (determining that petitioner was under *de facto* arrest when he was picked up, not told he was arrested but would have been restrained if he attempted to leave, driven to the police station, and placed in an interrogation room for questioning).

## IV. THE PAT-DOWNS AND BODY SEARCHES

During the traffic stop, Officer Moreira frisked and searched Rivera-Vasquez. Five minutes later, Officer Moreira frisked and searched Santillan. Defendants maintain that both frisks and both searches were unreasonable under the Fourth Amendment.

It is well established that warrantless searches and seizures are *per se* unreasonable under the Fourth Amendment unless they fall within one of several recognized exceptions. *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). One such exception is during a *Terry* stop and frisk. *Terry v. Ohio,* 392 U.S. 1 (1968). Under *Terry*, the search must meet two requirements: First, the investigatory stop must be lawful. *Arizona v. Johnson*, 555 U.S. 323, 327 (2009). Second, to proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous. *Id.* The weapons search must also be "confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." *Terry*, 392 U.S. at 29. When the officer's frisk dispels the risk of concealed weapons, the officer's exploration must end. *See Minnesota v. Dickerson*, 508 U.S. 366, 378 (1993).

"In a traffic-stop setting, the first *Terry* condition—a lawful investigatory stop—is met whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation." *Arizona*, 555 U.S. at 327. "The police need not have, in addition, cause to believe any occupant of the vehicle is involved in criminal activity." *Id.* "To justify a pat-down of the driver or a passenger during a traffic stop, however, just as in the case of a pedestrian reasonably suspected of criminal activity, the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous." *Id.* This rule applies to passengers as well as drivers, as the Supreme Court specifically "instructed that an officer making a traffic stop may order passengers to get out of the car pending completion of the stop" because the "same weighty interest in officer safety . . . is present regardless of whether the occupant of the stopped car is a driver or passenger." *Id.*

## A. Pat-Downs and Frisks of Both Defendants

Officer Moreira conducted pat-downs and frisks of both Defendants, and in the process removed wallets, cell phones, and other items from the Defendants' pockets.

Though Officer Moreira had authority to ask both Defendants to step out of the vehicle, *see Maryland v. Wilson*, 519 U.S. 408, 414-15 (1997) ("[A]n officer making a traffic stop may order passengers to get out of the car pending completion of the stop."), Officer Moreira still needed a reason to believe that each Defendant was armed and dangerous before he conducted a pat-down. *See Terry v. Ohio,* 392 U.S. at 27 ("[T]here must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime."). When asked what facts triggered Officer Moreira's pat-down of Rivera-Vasquez, Officer Moreira responded that it was the "nervous behavior, [Rivera-Vasquez's inability] to answer valid answers to simple questions, . . . [and the fact that Rivera-Vasquez] did not have any outstanding warrants which would justify a certain nervousness." (Hr'g Tr. 106:10-21.) Further, Officer Moreira testified that he performed the pat down because he wanted to make sure for his and Officer Cusano's safety that Rivera-Vasquez did not have any weapons on his person. (Hr'g Tr. 26:1-8.) With respect to Santillan, Officer Moreira testified that he likewise performed a pat down of Santillan for officer safety

26

to ensure against weapons. (Hr'g Tr. 12:17.)  In addition to the factors giving rise to suspicion with Rivera-Vasquez, Officer Moreira also observed an unknown bulge in the back pocket of Snatillan's pants. (Hr'g Tr. 32:18-22.)  Officer Moreira also testified that Santillan was hesitant to exit the Volkswagen, and looked over his area where he was sitting before leaving the vehicle. (Hr'g Tr. 30:21-31:6.)  Considering these facts in their totality, Officer Moreira likely had reasonable suspicion sufficient to conduct a pat-down on each Defendant. *See Adam v. Williams,* 407 U.S. 143, 146 (1972) (holding that a pat-down is reasonable to "allow the officer to pursue his investigation without fear of violence"); *see also United States v. Paulino,* 850 F.2d 93, 98 (2d Cir.1988) (holding that "furtive movement provided a legal basis for the protective search").

However, during Officer Moreira's frisk of each Defendant, his pat-downs extended into a search of both Defendants' pockets and the contents therein.  With Rivera-Vasquez, Officer Moreira removed Rivera-Vasquez's wallet from his back pocket, opened it, inspected it, and placed it on the trunk of the car.  Officer Moreira then reached into Rivera-Vasquez's front pocket and removed a mobile phone, opened it, inspected it, and placed it on the trunk of the Volkswagen.  Officer Moreira further reached into Rivera-Vasquez's other front pocket and inspected its

contents. (*Id.* at 12:27:15-12:28:10.) With Santillan, Officer

Moreira felt a "bulge," and extracted a "stack of U.S. currency

folded up in a rubber band." (Hr'g Tr. 32:21-24.) Officer

Moreira also removed and inspected the contents of Santillan's

pockets. (*Id.*)

A search for weapons must generally be "confined in scope

to an intrusion reasonably designed to discover guns, knives,

clubs, or other hidden instruments for the assault of the police

officer." *Terry v. Ohio,* 392 U.S. 1, 29, 88 S.Ct. 1868, 20

L.Ed.2d 889 (1968). If a law enforcement agent conducts a

protective weapons frisk and feels an object that he reasonably

believes could be a weapon, he may seize it. But the limits of

a *Terry* protective search are also well established: a

protective frisk "is not to discover evidence of a crime" but is

"strictly limited" to ascertaining whether the suspect has a

weapon "which might be used to harm the officer or others

nearby." *Minnesota v. Dickerson,* 508 U.S. 366, 373, 113 S.Ct.

2130, 124 L.Ed.2d 334 (1993) (quotations and citations omitted).

In this case, while *Terry* entitled Officer Moreira "to place his

hands on [Defendants'] pants and to feel the [contents] in the

pockets, [Officer Moreira's] continued exploration of the

pockets after he concluded that [they] contained no weapon was

unrelated to the sole justification for the search under *Terry*

28

and thus invalid." *Minnesota v. Dickerson*, 508 U.S. 366, 367 (1993); *see also United States v. Ponce,* 8 F.3d 989, 999 (5th Cir.1993) (removal of folded dollar bills from pocket during *Terry* weapons search was improper because the officer could not have thought they were a weapon); *U.S. v. Mitchell*, 2012 WL 6827387, at *8 (W.D.N.Y. Nov. 27, 2012). This extends to Officer Moreira's removal and inspection of wallets, cell phones, and the currency from Santillan's pocket. For each of these items, it was immediately apparent to Officer Moreira from touch that these items were not weapons, and his exploration must have ended there.[5] *See Evans v. Soloman*, 681 F. Supp. 2d 233, 247 (E.D.N.Y. 2010) (officer exceeded scope of *Terry* frisk when he removed a wallet from defendant's pocket, given the lack of evidence that the wallet and identification removed resembled a weapon); *Terry*, 392 U.S. at 30-31 (actions go beyond a pat down for weapons, which entails a "limited search of the outer clothing of ... persons in an attempt to discover weapons which might be used to assault [the officer]," when officer removes articles not resembling weapons).

---

[5] Officer Moreira's contention that he inspected the wallet to see if there was a razor blade or other weapon is immaterial, given that he did not in the first instance have the ability to remove a wallet from either Defendant's pocket once it was immediately apparent that the wallet was not a weapon. *See, e.g., Evans*, 681 F. Supp. 2d at 247.

Despite this fact, even if Officer Moreira had not removed items from either Defendant's pockets, these items would have been discovered upon a search of the Defendants during their arrest. *See United States v. Eng*, 971 F.2d 854, 861 (2d Cir. 1992). These items are thus admissible under the inevitable discovery doctrine. *See Nix v. Williams,* 467 U.S. 431, 444 (1984) ("[t]he doctrine of inevitable discovery, an exception to the exclusionary rule, allows unlawfully obtained evidence to be admitted at trial if the government can "establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means.").

## V. RIVERA-VASQUEZ'S CONSENT TO SEARCH THE VEHICLE

Defendants' maintain that Rivera-Vasquez's consent to search the vehicle was involuntary and assert instead that Rivera-Vasquez was merely acquiescing to Officer Moreira's show of authority.[6]

When the government relies on consent to "justify a warrantless search, it bears the burden of proving by a preponderance of the evidence that the consent was voluntary."

---

[6] The Court need not reach, however, whether Santillan had a reasonable expectation of privacy in the area under the passenger seat of the car where the search occurred, given that the search is determined reasonable under the Fourth Amendment. This likewise applies to Santillan's ability to challenge Rivera-Vasquez's consent to search the Volkswagen.

*United States v. Snype*, 441 F.3d 119, 131 (2d Cir. 2006).

Voluntariness is determined by reference to the totality of the circumstances. *See United States v. Isiofia*, 370 F.3d 226, 231 (2d Cir. 2004). When the totality of the circumstances reveals that a person's consent amounts to a "mere acquiescence in a show of authority," that person has not given voluntary consent. *See United States v.* Wilson, 11 F.3d 346, 351 (2d Cir. 1993). However, "while knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the *sine qua non* of an effective consent." *Id.* Just as it "would be thoroughly impractical to impose on the normal consent search the detailed requirements of an effective warning," so too would it be unrealistic to require police officers to always inform detainees that they are free to go before a consent to search may be deemed voluntary. *Id.* Other relevant factors include "whether the defendant was in custody and in handcuffs, whether there was a show of force, whether the agents told the defendant that a search warrant would be obtained, whether the defendant had knowledge of the right to refuse consent, and whether the defendant previously had refused consent." *United States v. Younis*, No. 10 Cr. 813 (JFK), 2011 WL 1485134, at *4 (S.D.N.Y. Apr. 19, 2011) (citing

*United States v. Lavan*, 10 F. Supp. 2d 377, 388 (S.D.N.Y. 1998)).

Officer Moreira obtained Rivera-Vasquez's consent at approximately 12:35 p.m. At this point, Rivera-Vasquez had been detained for approximately seventeen minutes, he had been questioned by Officer Moreira, patted-down and frisked, had his phone, wallet and identification removed, and was in the backseat of the patrol car. However, at no point in time was either Defendant handcuffed or placed under arrest, nor did the officers draw their firearms on the Defendants or show force in any way to impose their authority. (Hr'g Tr. 34:8-18.) And, at no point did Officer Moreira threaten or coerce Rivera-Vasquez into consenting to the search. (*Id.*) Though Rivera-Vasquez was placed in the back seat of the police patrol car and was not informed of his right to refuse consent, these factors are insufficient to vitiate consent. *See, e.g., U.S. v. Arango-Correa*, 851 F.2d 54, 58 (2d Cir. 1988) (holding that "the fact that [defendant] was in custody for five hours did not compel a finding that his consent was involuntary . . . [where] Defendant was well treated while in custody and was not subjected to the kind of intensive interrogation over many hours or days which would overwhelm the frightened prisoner and vitiate consent."); *Stawicki v. Israel,* 778 F.2d 380, 383 (7th Cir.1985) (5 1/2 hour

detention including 1 1/2 hour interrogation did not render confession involuntary), *cert. denied,* 479 U.S. 842 (1986); *Shriner v. Wainwright,* 715 F.2d 1452, 1455 (11th Cir.1983) (10-hour detention including five-hour interrogation did not render confession involuntary), *cert. denied,* 465 U.S. 1051 (1984) *United States v. Busic,* 592 F.2d 13, 22 (2d Cir.1978) (despite weariness due to long flight and little sleep, written consent was not involuntarily given); *cf. Miranda v. Arizona*, 384 U.S. 436, 495 (1966) (14-hour custody with lengthy interrogations by FBI and local police rendered confession involuntary). Indeed, far from exhibiting a coercive show of authority, Officer Moreira explained to Rivera-Vasquez that he would like him to take a seat in the rear of the patrol car and that he was not in any trouble. (Hr'g Tr. 27:1-8.) Taken together, the facts demonstrate that Rivera-Vasquez freely and voluntarily gave consent to search the vehicle, and that Officer Moreira reasonably understood Rivera-Vasquez's consent to be valid.[7]

---

[7] Nor did Rivera-Vasquez subsequently rescind his oral consent. To the contrary, at the precinct Rivera-Vasquez reaffirmed his consent and signed a written consent to search the entire Volkswagen, including the trap. *See United States v. Snow*, 44 F.3d 133 (2d Cir. 1995) (reversing district court's holding that search of closed bags inside the car exceeded scope of consent where suspect not informed of purpose of search).

## VI. DEFENDANTS' PRE-ARREST STATEMENTS

Defendants argue that all pre-arrest statements by Rivera-Vasquez and Santillan should be suppressed because they were "obtained by exploitation of the illegality of [their] arrest" and detention. *See Brown v. Illinois*, 422 U.S. 590, 602 (1975). Had Officer Moreira followed the law, according to Defendants, Santillan and Rivera-Vasquez would never have faced roadside interrogation. (Def. Mem. at 26.) However, Officer Moreira did not violate either Defendant's rights in removing them from the vehicle, or in asking them further questions. *See Maryland v. Wilson*, 519 U.S. 408, 408 (1997) ("An officer making a traffic stop may order passengers to get out of the car pending completion of the stop."); *see also United States v. Turvin*, 517 F.3d 1097, 1103-04 (9th Cir.2008) (holding that a 14-minute period of questioning was not unlawful because "officers do not need reasonable suspicion to ask questions unrelated to the purpose of an initially lawful stop [where the questioning] did not unreasonably prolong the duration of the stop").

Nor did the questioning rise to the level of an arrest, or a custodial interrogation requiring *Miranda* warnings. In determining whether a defendant is in custody for *Miranda* purposes, "the ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree

associated with a formal arrest." *California v. Beheler*, 463
U.S. 1121, 1125 (1983). Ordinary roadside traffic stops,
however, generally do not require the administration of *Miranda*
warnings, even though the suspect is not free to leave and has
thus been seized for Fourth Amendment purposes. *Berkemer v.
McCarty*, 468 U.S. 420, 439-40 (1984) (the "noncoercive aspect of
ordinary traffic stops prompts us to hold that persons
temporarily detained pursuant to such stops are not 'in custody'
for the purposes of *Miranda*."); *see also United States v. Wong
Ching Hing*, 867 F.2d 754, 756 (2d Cir. 1989) (holding that
suspect was not in custody for *Miranda* warnings during the 30-
minute traffic stop); *United States v. Perez*, No. 01 Cr. 848
(SWK), 2002 WL 1835601, at *6 (S.D.N.Y. Aug. 8, 2002) ("persons
temporarily detained pursuant to [traffic] stops are not 'in
custody' for the purposes of *Miranda*") (citation omitted);
*United States v. Fernandez-Jimenez*, No. 03 Cr. 1493 (RPP), 2004
WL 1598653, at *5 (S.D.N.Y. July 16, 2004) ("[a]lthough
motorists do not feel free to leave, traffic stops are not a
form of custodial interrogation because they are brief and
public.").

Two factors are relevant in deciding whether a lawful
traffic stop involves restraints sufficient to trigger *Miranda*
warnings: (1) "whether a reasonable person in the suspect's

shoes would have understood that his detention was not likely to be 'temporary and brief'"; and (2) "whether a person stopped under the circumstances at issue would feel that he was 'completely at the mercy of the police.'" *United States v. Newton*, 369 F.3d 659, 675 (2d Cir. 2004) (citations omitted). Circumstances relevant to this inquiry include "whether the detention is reasonably perceived as brief"; "the public nature of the scene"; and "the number of officers." *Cruz*, 255 F.3d at 83. Here, Officer Moreira performed a lawful traffic stop of the Volkswagen. Neither Defendant was handcuffed or placed under arrest during the roadside questioning. At the time of the roadside questioning, both Defendants were stopped on a public highway. The testimony also establishes that Officer Moreira explained to each Defendant that they were not under arrest, and neither officer brandished weapons during the stop. (Hr'g Tr. 27:1—6; 27:9-13; 33:1-18.) Given these circumstances, the Defendants were not "in custody" for the purposes of *Miranda* warnings during the stop, and their pre-arrest statements are valid.

## IV.  CONCLUSION

For the foregoing reasons, Defendants' motion to suppress is denied.

It is so ordered.

**New York, NY**
**August  6  , 2013**

_____
ROBERT W. SWEET
U.S.D.J.